IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* AIDAN FORSYTH,<br><br>Plaintiffs,<br><br>v.<br><br>CASTLE HARLAN INC.,<br>BRANFORD CASTLE, LP, and<br>JOHN K. CASTLE,<br><br>Defendants. | CIVIL FILE NO.: _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |

## INTRODUCTION

1.      This is a *qui tam* action brought against defendants Castle Harlan Inc. ("Castle Harlan"), Branford Castle, LP ("Branford Castle"), and JOHN K. CASTLE ("Castle") (collectively, "Defendants") under the False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA" or "Act"), to recover damages and civil penalties on behalf of the United States of America ("United States").

2.      In addition to damages and civil penalties, relator Aidan Forsyth ("Forsyth" or "Relator") also seeks to recover on his own behalf the maximum relator's share and attorneys' fees, expenses, costs, prejudgment interest, and other relief permitted under the FCA.

3.      The FCA qui tam allegations in this complaint ("Complaint") arise from Defendants' misconduct and practices concerning their unlawful receipt and retention of first-draw Paycheck Protection Program ("PPP") funds from the Small Business Administration ("SBA"), as summarized below.

## Castle Harlan PPP Loan

a.      Shortly before August 7, 2020, Defendants knowingly submitted, or caused others to submit, a loan application and loan-related information for a first draw PPP loan in the amount of $792,700.

b.      The application falsely stated Castle Harlan was eligible for a first draw PPP loan, when in fact, as Defendants well knew, Castle Harlan was ineligible because it was a private equity firm primarily engaged in investments and speculation, and also because, Castle Harlan did not meet PPP's need requirements.

c.      On or about August 7, 2020, Defendants received $792,700 in first-draw PPP funds, SBA loan number 5407068209 (the "Castle Harlan PPP Loan").

d.      Prior to June 11, 2021, Defendants applied for forgiveness of the Castle Harlan PPP Loan.

e.      On or about June 11, 2021, SBA forgave the principal amount of the Castle Harlan PPP Loan plus accrued interest, totaling $799,394.

## Branford Castle PPP Loan

f.      Shortly before April 28, 2020, Defendants knowingly submitted, or caused others to submit, a first draw PPP loan application and loan-related information for a loan in the amount of $256,900.

g.      The application falsely stated Branford Castle was eligible for a first-draw PPP loan, when in fact, as Defendants well knew, Branford Castle was ineligible because it was a private equity firm primarily engaged in investments and speculation, and also because, Branford Castle did not meet PPP's need requirements.

h.      On or about April 28, 2020, Defendants received $256,900 in first-draw PPP funds, SBA loan number 6569617209 (the "Branford Castle PPP Loan").

2

i.      Prior to June 11, 2021, Defendants applied for forgiveness of the Branford Castle PPP Loan.

j.      On or about June 11, 2021, SBA forgave the principal amount of the Branford Castle PPP Loan plus accrued interest, totaling $259,747.31.

4.      The conduct described above, and alleged elsewhere in this Complaint, violated 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G).

5.      As a result of Defendants' PPP fraud, the United States suffered economic losses and is entitled to treble damages and maximum civil penalties, the precise amount of which will be determined at trial.

## PARTIES, ENTITIES AND PERSONS

### Relator Forsyth

6.      Relator Forsyth is a resident of New York, New York.

### The United States

7.      The United States, acting through SBA, and supported by the U.S. Department of Treasury, is the real party-plaintiff-in-interest in the *qui tam* claims in this action.

8.      SBA's headquarters is located at 409 Third Street, SW, Washington, D.C. 20416.

9.      SBA was created in 1953 as an independent agency of the United States government ("Government") to aid, counsel, assist, and protect the interests of small business concerns, to preserve free competitive enterprise, and to maintain and strengthen the overall U.S. economy.

10.     Among other mandates, SBA assists small businesses in recovering from economic disasters, such as the coronavirus pandemic that adversely affected the U.S. economy beginning in early 2020.

11.     One of the instruments available to SBA in circumstances like the COVID-19 pandemic is the provision of forgivable low-interest loans to qualified borrowers.

**Defendant Castle Harlan**

12.     Defendant Castle Harlan is a private equity firm with its main offices located at 150 E. 58th Street, 38th Fl., New York, NY 10155. It also maintains offices in Palm Beach, Florida and Naples, Florida. Castle Harlan's main telephone number is 212-644-8600 and its principal website URL address is https://www.castleharlan.com.

13.     On its websites, and elsewhere, Castle Harlan describes itself as a private equity firm.

14.      Castle Harlan is a Delaware corporation that was formed in 1987.

15.     Castle Harlan is registered with the U.S. Securities and Exchange Commission ("SEC") as an investment advisor. Its SEC file number is 801-74023.

16.     According to its SEC investment advisor registration, Castle Harlan is a "large advisory firm," meaning it has regulatory assets under management of $100 million or more. See Form ADV, CRD Number 158106, Rev. 10/2021 (the "Castle Harlan ADV"), Item 2.A.

17.     As of 2021, Castle Harlan reported it had assets of $841,696,992 under management. Id. at Item 5.D.

18.     Castle Harlan is compensated for its investment advisory services by both a percentage of assets under its management and a performance-based fee. Id. at Item 5.E. Such dual fee arrangements are the hallmark of hedge fund and private equity fund advisory firms.

19.     The specific type of investment advisory services Castle Harlan provides is portfolio management for pooled investment vehicles (other than investment companies). Id. at Item 5.G.

20.     Castle Harlan has many financial industry affiliations and affiliates. Id.at Item 7.A.

4

21.    Castle Harlan is an advisor to many private equity funds that are exempt from registration under the Investment Company Act of 1940. Id. at Item 7.B. This indicates Castle Harlan engages in speculative investments.

22.    According to its website, Castle Harlan has raised $11 billion dollars or more through approximately 8 private equity funds.

23.    In 2022, Castle Harlan claimed it sold one of its portfolio companies (Tensar Corporation) for $550 million at a profit of $150 million, having acquired it in 2014 for $400 million.

### Defendant Branford Castle

24.    Defendant Branford Castle is a private equity firm, with its main offices located at 150 E. 58th Street, 37th Fl., New York, NY 10155. It also maintains offices in Boca Raton, Florida. Castle Harlan's main telephone number is 212-317-2004 and its principal website URL address is https://www.branfordcastle.com.

25.    On its websites, and elsewhere, Branford Castle describes itself as a private equity firm.

26.     Branford Castle is a Delaware limited partnership that was formed in 1986.

27.    Branford Castle is registered with the SEC as an exempt investment advisor. Its SEC file number 802-100446 and its FINRA CRD number is 269942.

28.    Branford Castle claims to have raised more than $300 million through the private placement of interests in two private equity funds.

29.    The Castle Harlan ADV lists Branford Harlan's URL address and LinkedIn social media address as websites for which Castle Harlan controls the content. Castle Harlan ADV, Section 1.I.

5

30.    According to the Castle Harlan ADV, Branford Castle and its private equity funds are financial affiliates of Castle Harlan and a number of the private equity funds for which Castle Harlan is the general manager. Castle Harlan ADV, Section 7.A and Schedule R.

31.    There is significant overlap in the people managing and operating Castle Harlan and Branford Castle, including Defendant Castle (dual Chairman), David Castle (Chief Administrative Officer of Castle Harlan/Managing Partner of Branford Castle), David B. Pittaway (dual Vice Chairman and Chief Compliance Officer), James Reddington (dual Chief Financial Officer), and Marilyn Yang (dual Vice President). Defendants are prohibited from using the same payroll expenses to support two or more PPP loan applications.

### Defendant Castle

32.    Defendant Castle resides in New York, New York.

33.    Castle has been the CEO, Chairman of the Board of Directors and a shareholder of Defendant Castle Harlan since April 1987.

34.    Castle is the Chairman of Branford Castle.

35.    Castle is the former President and CEO of investment bank Donaldson, Lufkin & Jenrette, Inc.. He reportedly received a Bachelor's degree from MIT and an MBA Harvard.

### Non-Party PPP Lender Equity Bank

36.    SBA contracted with numerous banks and other financial institutions to serve as PPP loan processors, underwriters, and lenders during 2020 and 2021.

37.    Equity Bank's address and telephone number are: 345 N Andover Rd Andover, Kansas 67002 and 800-856-5807.

38.    Equity Bank contracted with SBA to process, underwrite, and make PPP loans.

39.     Defendants submitted, or caused others to submit both the Castle Harlan PPP Loan and Branford Castle PPP Loan application and loan-related information to Equity Bank, including the request for SBA to forgive both PPP loans.

## JURISDICTION AND VENUE

40.     This Court has original subject matter jurisdiction over the FCA *qui tam* claims alleged in this Complaint under 28 U.S.C. § 1331 (federal question) and 31 U.S.C. § 3732(a) (False Claims Act).

41.     This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because Defendants can be found, reside, or transact business in this district. Section 3732(a) of the FCA further provides for service of process at any place within or outside the United States.

42.     Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because Defendants can be found, reside, and transact business in this district; acts proscribed by 31 U.S.C. § 3729 occurred within this district; and a substantial part of the events or omissions giving rise to the *qui tam* claims alleged in this Complaint occurred in this district.

## FCA SUBJECT MATTER JURISDICTION

43.     Relator brings this *qui tam* action pursuant to 31 U.S.C. 3730(b).

44.     Upon information and belief, none of the subject matter or other jurisdictional bars, preclusions, restrictions, or limitations set forth in Section 3730 of the FCA is applicable to this action.

## LIABILITY, DAMAGES, AND AWARDS UNDER THE FCA

45.     The FCA imposes civil liability on "any person" who, among other things:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;...or

7

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. §§ 3729(a)(1)(A), (B) and (G).

46.     Section 3729(b)(1) of the Act defines the terms "knowing" and "knowingly" to

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

47.     Section 3729(b)(2) of the Act defines "claim" to mean any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded, or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2)(A) (as amended May 20, 2009; the prior version is materially identical for purposes of this action).

8

48.    Section 3729(b)(3) of the Act defines the term "obligation" to mean an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.

49.    Section 3729(b)(4) of the Act defines the term "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

50.    Section 3729(a) of the Act provides that any person who knowingly violates the FCA is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461, Public Law 104-410), which currently sets the minimum penalty at $13,508 and the maximum penalty at $27,018, plus three times the amount of damages the Government sustains because of an act of that person.

51.    Section 3730(d) of the Act provides that where the Government intervenes in and proceeds with an action commenced by the filing of a *qui tam* complaint pursuant to 31 U.S.C. § 3730(b), and recovers money or property from a defendant under Section 3729, the person who initiated the action (known as the "relator"), shall receive between fifteen percent (15%) and twenty-five percent (25%) of the proceeds, subject to certain exceptions and limitations, none of which applies here.

52.    Where the Government does not intervene in the *qui tam* action and the relator pursues it without the Government's involvement and recovers proceeds from a defendant under Section 3729, the relator, again, subject to certain exceptions and limitations that do not apply here, shall receive between twenty-five percent (25%) and thirty percent (30 %) of the proceeds. 31 U.S.C. § 3730(b).

9

53.     Whether the Government intervenes in the matter or not, the relator in a successful *qui tam* action is also entitled to an award against the defendant for the amount of all reasonable expenses, attorneys' fees, and costs incurred in pursuing the *qui tam* claims. *Id.*

## FCA'S STATUTE OF LIMITATIONS

54.     A *qui tam* claim under section 3730(b) of the FCA may not be brought (1) more than 6 years after the date on which the violation of section 3729 is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last. 31 U.S.C. § 3731(b).

## PPP LAWS, REGULATIONS, RULES AND FORMS

### CARES Act and Related Legislation

55.     On March 13, 2020, President Trump declared the ongoing Coronavirus Disease 2019 (COVID–19) pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, territories, and the District of Columbia.

56.     On March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") (Pub. L. 116–136) to provide emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic.

57.     Section 1102 of the CARES Act temporarily permitted SBA to guarantee 100 percent of so-called "7(a) loans" under a new program titled the "Paycheck Protection Program," pursuant to section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)). Section 1106 of the CARES Act provided for forgiveness of up to the full principal amount of qualifying loans

10

guaranteed under the Paycheck Protection Program. PPP loans were available at a 1 % interest rate.

58.    During 2020, the President signed into law four acts supplementing the CARES Act, namely: the Paycheck Protection Program and Health Care Enhancement Act ("Enhancement Act") (Pub. L. 116–139) on April 24, 2020; the Paycheck Protection Program Flexibility Act of 2020 ("Flexibility Act") (Pub. L. 116–142) on June 5, 2020; Public Law 116–147 ("PL 116-147") on July 4, 2020; and the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act ("Economic Aid Act") (Pub. L. 116–260) on December 27, 2020.

## PPP Governing Regulations

59.    PPP was added to, and included within, SBA's existing Section 7(a) loan program. Unless expressly excepted, PPP eligibility issues were governed by SBA's general rules and regulations concerning small business loans.

60.    13 CFR § 120.110 sets forth a list of specific types of businesses, organizations and borrowers that are ineligible for SBA business loans generally.

61.    "Speculative businesses" are listed among such borrowers that are ineligible for SBA business loans generally.

62.    Speculative businesses never received an exemption from the restrictions of 13 CFR § 120.110 to permit them to participate in PPP.

## SBA PPP Authoritative Guidance: SOPs, IFRs and FAQs

63.    Effective April 1, 2019, SBA issued Standard Operating Procedure ("SOP") SOP 50 10 5(K) as guidance for the Section 7(a) loan program. This included an elucidation on various types of ineligible borrowers. Id. at Subpart B, Section III.

64.    SOP 50 10 5(K) reaffirms 13 CFR § 120.110 directive that "Speculative businesses are not eligible" for SBA loans. Id. at sub-section III.A.18. 59. SOP 50 10 5(K) further describes

11

the two defining characteristics of speculative businesses, namely, that "their sole purpose is to purchase and hold an item until the market price increases" and "they engage in a risky business for the chance of an unusually large profit." Id. at sub-section 18.a.

65.     SOP 50 10 5(K) explicitly identifies businesses "Dealing in stocks, bonds, commodity futures, and other financial instruments" as being among the types of ineligible speculative businesses precluded from participating in SBA loan programs. Id. at sub-section 18.b.ii.

66.     Effective October 1, SBA issued SOP 50 10 6, which replaced SOP 50 10 5(K).

67.     SOP 50 10 6, Part 2, Section A, Chapter 3 identified the types of business that are ineligible for SBA loans generally. Sub-section A.18 of the new SOP tracks the language of its predecessor SOP concerning speculative businesses.

68.     During 2020, SBA issued approximately 20 interim final rules ("IFRs") providing guidance on first draw PPP loans. These IFRs were consolidated by SBA's last first draw IFR, which was posted on January 14, 2021 and made effective January 12, 2021 for most parts. Docket No. SBA-2021-0001, "Final Interim Final Rule for First Draw PPP Loans," 86 FR 3692 (effective 1/12/2021).

69.     On March 22, 2021 SBA published IFI Second Draw (Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by American Rescue Plan Act 86 FR 15083 (effective 3/18/2021) as guidance on second draw PPP loans.

70.     During 2020, SBA published a number of interpretive Frequently Asked Questions ("FAQs") on its website regarding PPP borrower eligibility, among other things relating to the program. See www.sba.gov.

12

71.    At all times relevant hereto, SBA publicly urged prospective PPP borrowers to contact SBA to answer questions concerning PPP eligibility and directed them to Lender Relations Specialists in local SBA Field Offices. See, e.g., 85 FR 20816 / Vol. 85, No. 73 / Wednesday, April 15, 2020.

## Hedge Funds and Private Equity Firms Expressly Deemed Ineligible for PPP

72.    By published IFR effective April 28, 2020, SBA and the U.S. Department of Treasury declared that "hedge funds and private equity firms" were ineligible for PPP loans. 85 FR 23450, 23451, 4/28/2020.

73.    Specifically, SBA posted the following rule clarification:

2. Clarification Regarding Eligible Businesses

a.    Is a hedge fund or private equity firm eligible for a PPP loan?

No. Hedge funds and private equity firms are primarily engaged in investment or speculation, and such businesses are therefore ineligible to receive a PPP loan.

Id.

74.    The rule went on to explain:

The Administrator [of SBA], in consultation with the Secretary [of Treasury], does not believe that Congress intended for these types of businesses, which are generally ineligible for section 7(a) loans under existing SBA regulations, to obtain PPP financing.

Id.

## PPP LENDING HISTORY

75.    Congress offered PPP loans in two separate rounds or "draws."

76.    The first-draw application period began in or about March 2020 and ended in or about May 2020.

77.    The second-draw application period, which was available for certain eligible first-draw borrowers, began in or about January 2021 and ended in or about March 2021.

13

78.     In total, PPP borrowers received over $800 billion in guaranteed, low-interest and forgivable loans.

79.     Because of the overwhelming need to disburse financial relief as quickly as possible to small businesses during the early stages of the coronavirus pandemic, SBA did not require stringent lending oversight on individual PPP loan applications requesting less than $2 million.

80.     SBA effectively created an "honor system" among the applicants, the lenders, and SBA.

81.     SBA's Office of Inspector General ("OIG") has since publicly acknowledged that there was massive fraud in the applications for, and receipt of, PPP funds.

82.     On September 14, 2022, the U.S. Department announced the establishment of a COVID-19 fraud strike force to combat rampant COVID-19 relief program fraud, including PPP.

### PPP First Draw Rules and Regulations

83.     PPP rules required the funds for first-draw loans to be expended solely on "authorized purposes," also referred to as, "allowable uses" or "permissible expenses"; "authorized purposes" included payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities.

84.     PPP rules defined "payroll costs" to include wages, salaries, tips, and commissions, as well as certain non-cash employment benefits: employer contributions to defined-benefit or defined-contribution retirement plans; payment for the provision of group health care coverage, including insurance premiums; payment of state and local taxes assessed on employee compensation; and costs for employee vacation, parental, family, medical, and sick leave.

85.     The CARES Act excluded from the definition of "payroll costs" for PPP loan application purposes any employee compensation in excess of an annual salary of $100,000.

14

86.    PPP rules and regulations also precluded a borrower from including as payroll costs payments made to self-employed, independent contractors ("1099 Employees") and to persons not residing in the United States.

87.    To be a qualified borrower for PPP purposes, a small business (or nonprofit organization) had to be in existence on February 15, 2020, and have employees for whom it paid salaries and payroll taxes or have paid independent contractors, as reported on IRS Forms 1099-MISC.

88.    The borrower could be an independent contractor, eligible self-employed individual, sole proprietorship, or organization employing no more than 500 employees (with certain exceptions allowing a greater number).

## SBA Form 2483

89.    To obtain PPP funding, the eligible and qualified borrower had to prepare and submit to a participating lender an SBA PPP loan application form ("Form 2483"), signed by the borrower or an agent or representative, as well as certain supporting documentation and information.

90.    Form 2483 was revised a number of times, but the original version was dated 04/20.

91.    Form 2483 required the borrower to specify, among other details, its (a) "Average Monthly Payroll" and (b) "Number of Employees."

92.    Under PPP rules, the Average Monthly Payroll and Number of Employees figures were used to set the maximum amount of funds the borrower was eligible to receive.

93.    That maximum sum was calculated as the borrower's Average Monthly Payroll during a prescribed period multiplied by 2.5, with certain adjustments if the borrower had received an SBA Economic Injury Disaster Loan ("EIDL").

15

94.    The average monthly payroll cost was derived by aggregating allowable payroll costs from the prior twelve months (with certain exceptions) for employees whose principal place of residence was the United States and subtracting compensation paid to any employee in excess of an annual salary of $100,000. That figure was then divided by twelve to arrive at the average monthly payroll cost. Regardless of the borrower's actual calculated average monthly payroll, the maximum PPP for any single loan could not exceed $10 million.

95.    Form 2483 further required applicants to specify the purpose of the loan, namely, "Payroll," "Lease/Mortgage Interest," "Utilities," or "Other," the last of which required the applicant to "explain."

96.    Form 2483 also required the borrower to affirm, among other things, having read and understood Form 2483 and the borrower's eligibility to receive a PPP loan under the SBA rules in effect at the time the application was submitted.

97.    Form 2483 required the borrower to certify (by initialing) that:

> All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule.

98.    Form 2483 required the borrower to certify (by initialing) that:

> Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

99.    Form 2483 required the borrower to certify (by initialing) that:

> The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule. I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

100.    Form 2483 required the borrower to certify (by initialing) that:

I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs.

101.    Form 2483 required the borrower to certify (by initialing) that:

During the period beginning on February 15, 2020, and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program.

102.    Form 2483 required the borrower to certify as follows:

I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

## PPP Loan Application Processing

103.    First-draw PPP loans were processed by SBA-authorized participating lenders.

104.    To obtain the requested loan amount, prospective borrowers were required to provide the lenders, among other things, the Form 2483 and supporting loan application documentation, such as IRS or state revenue department forms showing periodic employment and unemployment tax information for the borrower, such as IRS Forms 940 (Employer's Annual Federal Unemployment ("FUTA") Tax Return), 941 (Employer's Quarterly Federal Tax Return), W-2 (Wage and Tax Statement), and W-3 (Transmittal of Wage and Tax Statements) for the employees the borrower was claiming.

105.    Where the PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which the SBA guaranteed 100%.

17

106.    At or about the time PPP loans were approved, the lenders conveyed the borrowers' loan application information to the SBA.

## PPP Loan Forgiveness

107.    The PPP rules as finally implemented required, for loan forgiveness purposes, that the PPP funds be expended for authorized purposes during the 24-week period following receipt of the loan proceeds and that at least 60% of the loan proceeds were used for covered payroll expenses.

108.    Approved borrowers seeking forgiveness were required by the terms of Form 2483 to provide the lenders with documentation verifying the number of full-time equivalent employees on the borrower's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the 24-week period following receipt of the loan proceeds.

## SBA Form 3508

109.    To obtain PPP loan forgiveness borrowers had to submit an SBA Form 3508 to the lender according to the instructions set out in SBA Form 3508EZ.

110.    Form 3508 required the borrower to certify that:

> The dollar amount for which forgiveness is requested: was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments);...
>
> I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.
>
> The information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects. I understand that knowingly making a false statement to obtain forgiveness of an SBA-guaranteed loan is punishable under the law, including 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment

18

of not more than two years and/or a fine of not more than $5,000; and, if submitted to a Federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

## MATERIALITY ALLEGATIONS

111. Upon information and belief, prior to receiving notice of Relator's allegations, the United States was unaware of the false and fraudulent Form 2483 Defendants submitted, or caused others to submit, to Equity Bank and the SBA.

112. Upon information and belief, a PPP borrower's affirmation and certification that it was eligible to receive a PPP loan under the SBA rules in effect at the time the application was submitted and met the program's financial need requirements were material to the SBA's decisions to make PPP funds available to borrowers and to forgive their PPP loans.

113. Specifically, not truthfully and accurately disclosing a borrower's status as a "private equity firm" and the fact that current economic uncertainty did not make a PPP loan necessary to support the ongoing operations of the applicant were material to the SBA's PPP lending and forgiveness decision-making process.

## FACTUAL ALLEGATIONS CONCERNING PPP FRAUD

114. The following allegations are made upon information and belief because Relator does not have, and cannot presently obtain, Defendants' loan application, forgiveness forms, and related information and materials.

### Castle Harlan PPP Loan

115. On or before August 7, 2020, Defendants submitted Form 2483 in the name of Castle Harlan to Equity Bank for a $792,700 first draw PPP loan.

116. Castle Harlan's Form 2483 affirmed that Castle Harlan was eligible to borrow PPP funds.

117. In fact, at the time of its PPP loan application submission, Castle Harlan was an ineligible private equity firm.

118. Defendants knew Castle Harlan was a private equity firm, and thus ineligible for PPP funding, at the time they submitted the Form 2483 to Equity Bank.

119. On or about August 7, 2020, Defendants' PPP loan application was approved. SBA loan number 5407068209.

120. Shortly after August 7, 2020, Castle Harlan received $792,700. in PPP loan funds.

121. Prior to June 11, 2021, Defendants submitted a Form 3508 to Equity Bank seeking complete forgiveness of Castle Harlan's PPP loan and accrued interest.

122. On or about June 11, 2021, SBA forgave the principal and accrued interest for Castle Harlan's PPP loan, in the total amount of $794,394.

### Branford Castle PPP Loan

123. On or before April 28, 2020, Defendants submitted a Form 2483 in the name of Branford Castle to Equity Bank for a $256,900 for a first draw PPP loan.

124. Branford Castle's Form 2483 affirmed that Branford Castle was eligible to borrow PPP funds.

125. In fact, at the time of its PPP loan application submission Branford Castle was an ineligible private equity firm.

126. Defendants knew Branford Castle was a private equity firm, and thus ineligible for PPP funding, at the time they submitted Form 2483 to Equity Bank.

127. On or about April 28, 2020, Branford Castle's PPP loan application was approved. SBA loan number 6569617209.

128. Shortly after April 28, 2929, Branford Castle received $256,900 in PPP loan funds.

20

129.    Prior to June 11, 2021, Defendants submitted a Form 3508 to Equity Bank seeking complete forgiveness of the Branford Castle PPP Loan and accrued interest.

130.    On or about June 11, 2021, SBA forgave the principal and accrued interest for Branford Castle PPP Loan, in the total amount of $259,747.31.

## MATERIALITY

131.    SBA rules and regulations in effect at the time Castle Harlan's PPP loan was forgiven precluded private equity firms, such as Castle Harlan, from lawfully receiving and retaining first-draw PPP loan proceeds.

## FACTUAL ALLEGATIONS CONCERNING SCIENTER

132.    The PPP laws, rules, regulations, and forms relevant to this action are clear and unambiguous, including the bar on private equity firms receiving SBA business loans generally and PPP loans specifically.

133.    SBA published clear and authoritative guidance through SOPs and IFRs clarifying that private equity firms were eligible for first-draw PPP loans.

134.    Castle Harlan website and its ADV registration with the SEC establish that Castle Harlan is a private equity firm.

135.    Branford Harlan website establish that Branford Castle is a private equity firm.

136.    Defendant Castle is a highly educated and sophisticated finance executive who is presumed to know the contents of its website, SEC ADV and the SBA rules and regulations barring private equity firms from borrowing PPP funds.

137.    Upon information and belief, Defendants never contacted SBA to ask if Castle Harlan or Branford Castle were eligible for a PPP loan and/or were advised by SBA that Castle Harlan or Branford Castle were eligible.

21

## CLAIMS FOR RELIEF

## COUNT I

## As to All Defendants

## Violation of 31 U.S.C. § 3729(a)(1)(A) (False or Fraudulent Claims)

138.    Relator realleges and incorporates all allegations in this Complaint as though fully set forth herein.

139.    The FCA imposes liability on any person who, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

140.    Through the acts described above, and otherwise, Defendants, by and through their employees, agents, and representatives, knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented, or caused to be presented, to an SBA-authorized PPP lender and to an officer or employee of the SBA, a false or fraudulent Form 2483 and related loan materials and information, all in violation of 31 U.S.C. § 3729(a)(1)(A).

141.    As a result of the foregoing activities, the United States suffered economic damages.

## COUNT II

## As to All Defendants

## Violation of 31 U.S.C. § 3729(a)(1)(B) (False Records or Statements)

142.    Relator realleges and incorporates all allegations in this Complaint as though fully set forth herein.

143.    The FCA imposes liability on any person who, among other things, knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

22

144.    Through the acts described above and otherwise, Defendants, by and through their employees, agents, and representatives, knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, used or caused to be made or used a false record or statement material to a false or fraudulent claim, namely by making and submitting the above-described Form 2483 and supporting loan documentation to an SBA-authorized PPP lender and to the SBA, all in violation of 31 U.S.C. § 3729(a)(1)(B).

145.    As a result of the foregoing activities, the United States suffered economic damages.

## COUNT III

### As to All Defendants

### Violation of 31 U.S.C. § 3729(a)(1)(G)  (Wrongful Retention)

146.    Relator realleges and incorporates all allegations in this Complaint as though fully set forth herein.

147.    The FCA imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(G).

148.    Through the acts described above, and otherwise, Defendants, by and through their employees, agents, and representatives, knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, wrongfully retained overpayments on the Castle Harlan and Branford Castle PPP loans by obtaining SBA forgiveness of the principal amount and accrued interest, all in violation of 31 U.S.C. § 3729(a)(1)(G).

23

149.    As a result of the foregoing activities, the United States suffered economic damages.

## PRAYER FOR RELIEF

WHEREFORE, pursuant to 31 U.S.C. § 3730(b), acting on behalf of, and in the name of, the United States and on his own behalf, Relator demands and prays that judgment be entered in favor of the United States and Relator and against Defendants as follows:

### As to Counts I, II and III

1.    On behalf of the United States, for:

a.    Treble the amount of the United States' damages, plus the maximum statutory penalties for each false claim or false statement;

b.    All costs of this civil action; and

c.    Prejudgment interest.

2.    And further, on his own behalf, Relator demands and prays that an award be made in his favor for:

d.    25 percent (25%) of any recovery by the United States if it intervenes in and conducts this action, or 30 percent (30%) of any recovery if the United States does not intervene;

e.    An amount for reasonable expenses necessarily incurred by Relator in prosecution of these claims and all reasonable attorneys' fees, expenses, and costs incurred by Relator in pursuing these claims; and

f.    such other and further relief to which this Court determines Relator is entitled.

24

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relator demands that this case be tried before a jury.

Respectfully submitted this 26th day of April 2023.

MCINNIS LAW

Timothy J. McInnis, Esq. [TM 7151]
N.Y. State Bar No. 2205086
521 5th Avenue, 17th Floor
New York, NY 10175-0038
Tel. (212) 292-4573
Fax (212) 292-4574
tmcinnis@mcinnis-law.com
Attorney for Plaintiff-Relator

25